[No. F045016. Fifth Dist. Sept. 8, 2004.]

In re ETHAN N., a Person Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and
Appellant, v.
CARRIE B., Defendant and Respondent.

**COUNSEL**

B. C. Barmann, Sr., County Counsel, and Jennifer L. Thurston, Deputy County Counsel, for Plaintiff and Appellant.

Barbara S. Cohen, under appointment by the Court of Appeal, for Defendant and Respondent.

## OPINION

**DAWSON, J.**—The Kern County Department of Human Services (department) appeals from an order granting reunification services to Carrie B., claiming such services were not shown to be in her child's best interest. We agree and reverse.

## PROCEDURAL AND FACTUAL HISTORY

One-week-old Ethan was named in a juvenile dependency petition filed in September 2003, pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (j).[1] The petition alleged Ethan was at risk of suffering physical harm or illness due to his mother's involvement with illegal controlled substances (§ 300, subd. (b)).[2] It also alleged, pursuant to section 300, subdivision (j), (1) that Ethan's half siblings, Jacob and Alexis, had been adjudged dependents of the court in July 1997 pursuant to section 300, subdivisions (a), (b), (g) and (j); (2) that reunification services as to Jacob and Alexis had been provided but had been terminated in August 1998 and permanent legal guardianship had been ordered; (3) that a half sibling, Justin, had been adjudged a dependent of the court in January 2001 pursuant to section 300, subdivisions (a), (b), (d), (f), and (j); (4) that reunification services as to Justin had been denied pursuant to section 361.5, subdivision (b)(4) and (10), and parental rights as to Justin had been terminated. A detentional social study report filed with the petition in the present case further stated that another son, Charles, had been murdered by Carrie's husband, who had been sentenced to life in prison without possibility of parole for the murder. Ethan was detained based on the reasons set forth in the petition and the social study report.

An amended petition filed a month later alleged, pursuant to section 300, subdivision (f), that Ethan was at risk of suffering serious physical harm or injury from Carrie, as her neglect had caused the death of Ethan's half sibling, Charles, who died at one month of age in 2001. The petition alleged Charles died as the result of Carrie's neglect, "in that [he] . . . sustained injuries consisting of an obstruction of the esophagus, a contusion to the lower portion of the head, a contusion to the lower back, a burn on the buttocks, anal penetration, six broken ribs, and evidence of six prior broken ribs."

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] Ethan's father, James N., is deceased.

Following a contested jurisdictional hearing, Ethan was found to be a person described by section 300, subdivisions (b), (f) and (j).[3] In anticipation of the contested dispositional hearing, the social worker filed a social study and two supplemental reports chronicling the extensive services Carrie had received for Jacob, Alexis, and Justin, as well as numerous referrals received for abuse and neglect of those three children. The report also detailed the events of Charles's death.

Specifically, the report stated Jacob was born in 1992 with a positive toxicology screen for methamphetamine. Following an investigation by the social worker, it was determined the home, which included Jacob's father, Paul K., was appropriate and the case was closed.

A half year later, in 1993, a law enforcement referral was made alleging Carrie and Paul were unable to provide for Jacob. An investigation revealed Carrie and Paul had recently used methamphetamine, and there were bruises on Jacob's forehead. Jacob was taken into protective custody and adjudged a dependent child. Reunification services were ordered.

In October 1994, a referral was made alleging Carrie was incapable of caring for Jacob's newborn sister, Alexis. Carrie admitted using drugs the day before Alexis' birth. Carrie separated from Paul for a short period, reportedly due to spousal abuse, but returned to the relationship. Following reunification services, Carrie regained custody of Jacob and Alexis in September 1995.

A number of referrals were made in 1996 and early 1997 alleging various injuries to Jacob and Alexis, but the allegations were not found to be substantiated. A referral in April 1997 alleged Carrie failed to protect Jacob and Alexis from physical abuse by Christopher B., Carrie's boyfriend, and that Carrie failed to provide her children with medical care. As a result, the children again were adjudged dependents of the court and reunification services again were ordered, including counseling for substance abuse, child neglect, and parent training. Carrie and Christopher also were ordered to submit to random drug tests. Carrie made only minimal progress with the case plan; reunification services were terminated in August 1998; legal guardianship was ordered for both Jacob and Alexis.

In June 1998, Carrie delivered Justin, whose father was Christopher. A petition was filed on Justin's behalf, because Carrie was incarcerated at the time and his half siblings were dependents of the juvenile court. The child was placed with Christopher, but was later returned to both Carrie and Christopher after Carrie completed reunification services.

---

[3] Thus, Carrie was found in this case, as she had been found in Justin's case, to have caused the death of Charles "through abuse or neglect." (§ 300, subd. (f).)

In January of 2001, a referral alleged severe neglect of another child, Charles, whose father also was Christopher. At the age of 39 days, Charles was brought to the hospital by Carrie and Christopher with a golf ball-sized wad of paper lodged deep in his esophagus. The child died as a result of cerebral hypoxia. At the time of his death, Charles also had severe injuries to his rectum and anus, 12 broken ribs in various stages of healing, injuries to his face, a torn frenulum, and a contusion to the back of the head. Examining experts determined that Charles had suffered repeated and extensive abuse.

During the investigation following Charles's death, Carrie denied knowing how Charles died. She had noticed a rash on the baby's bottom, but had not taken him to the doctor because Christopher told her the baby would be taken into protective custody.

As a result of Charles's death, Justin was taken into protective custody and was found to be a dependent of the juvenile court. Family reunification services were not provided because Carrie had failed to unify with Jacob and Alexis, and because she had caused the death of Charles through abuse or neglect. Parental rights as to Justin were terminated in February 2002.

In the current action, the social worker recommended that Carrie not be offered reunification services based on her failure to reunite with Jacob, Alexis, and Justin (§ 361.5, subd. (b)(10) & (11)), and because Carrie caused the death of Charles through abuse or neglect (*id.*, subd. (b)(4)).

At the contested dispositional hearing, the social worker, Cathy Tessandori, testified that the initial plan established at the time of detention consisted of "[p]arenting, child neglect, failure to protect, substance abuse counseling, and submitting to unannounced drug testing on a monthly basis." Supervised visits were scheduled for one hour per week. Tessandori testified that Carrie had completed a parenting class. She was enrolled in a class addressing issues of parent training, child neglect and failure to protect, and had completed 15 of the 25 sessions at the time of the hearing. Carrie had completed the substance abuse residential treatment program. She had provided eight drug tests since Ethan had been detained, and all had been clean.

Tessandori testified that Carrie attended all visitations with Ethan, except one, which she missed because of a dental appointment. Tessandori supervised the visits and found Carrie's behavior toward Ethan to be appropriate and their interaction normal. According to Tessandori, all of the certificates and information she received from various agencies and programs showed Carrie had made positive progress in each. According to Tessandori, "She's demonstrating steady progress in her case plan."

Carrie testified and acknowledged that her two oldest children had been removed from her as a result of her substance abuse and physical abuse by

Christopher. She explained that she had gone through reunification services, but had been unable to overcome her substance abuse problems at that time. She also acknowledged that her child Justin, whose father was Christopher, had been removed from her due to her substance abuse, the earlier dependency proceedings, and eventually due to Charles's death. Carrie testified that her son Charles was killed by his father Christopher, and that she was not charged with any crime in connection with Charles's death. At the time Justin was removed from Carrie, she participated in additional substance abuse counseling, but did not complete the program because there was no possibility of reunification with Justin. According to Carrie, ". . . I gave up. I quit because I wasn't getting anything so it would have been for nothing."

After Charles's death, Carrie was convicted of possession of methamphetamine for sale and spent time in jail. Following that conviction, Carrie entered a substance abuse program, which she completed, and then entered an outpatient program as well as attending Narcotics Anonymous meetings.

Carrie acknowledged that the court previously had found she had failed to protect her children from Christopher. She also acknowledged that the court in Justin's case found either her "active participation or neglect" caused the death of Charles. She testified that she thought she had made "a lot of progress" in the area of protecting her children from the conduct of others, but still had "a little ways to go with it." She also opined that her previous attempts at drug treatment had not been successful because she had not accepted that she could never use drugs again. Her current attempt was successful because she no longer had such "reservations." She testified that she was "enjoying" her recovery and taking it very seriously, but also acknowledged that recovery was a "lifetime process."

On cross-examination, Carrie acknowledged that her enrollment in the drug treatment programs were conditions of her probation. When asked if she accepted any responsibility for the death of Charles, and if so, what, Carrie stated, "I don't know." Carrie was asked why she thought it would be in Ethan's best interest that she be provided reunification services, and she stated, "Because I'm his mother and I know people love him, but I can provide for him. I just need a chance to show everybody that I can." Carrie stated she did not participate "in any way, shape or form in causing" the death of Charles.

On redirect examination, Carrie testified that her role in Charles's death was a failure to protect him but claimed the first time she was aware of any injuries to him was on the morning she took him to the hospital.

Both the department and counsel for the minor asked that the court not provide Carrie with reunification services. Counsel for the minor cited

Carrie's history of substance abuse, her failure to protect her children from abuse, and her failure to take responsibility for the death of Charles. Counsel for the department submitted on the points and authorities which requested that Carrie not be provided reunification services.

The court ruled: ". . . I do feel that [Carrie] has made significant progress towards alleviating or mitigating the causes of the children's placement in out-of-home care, and I am inclined to and I would find by clear and convincing evidence that it would be in the best interest of the child that reunification services be offered, although by my calculation, unless there is some extension of time, that period would run rather quickly. . . . [¶] . . . [¶] I would indicate as it relates to Subsection (10) of 361.5, that the parent has made—I'm not able to make a finding that the parent has not made reasonable efforts to treat the problems that led to the removal of the sibling or half-siblings and that child from a parent or guardian."

Counsel for the department reminded the court that section 361.5, subdivision (c) states that the court may not order reunification services where the parent has been found to have caused the death of a sibling through abuse or neglect "unless the Court finds by clear and convincing evidence that reunification is in the best interest" of the child. The court replied, "Which I did. So reunification services are to be provided to the mother . . . ."

## DISCUSSION

### The Trial Court Erred in Granting Reunification Services

The department contends the juvenile court's order of reunification services to Carrie was not supported by the evidence and constitutes an abuse of discretion. We agree.

■ Section 361.5, subdivision (a) explicitly directs the juvenile court to order child welfare services for the child and the child's parents whenever a child is removed from a parent's custody. "This requirement implements the law's strong preference for maintaining the family relationship if at all possible. [Citation.]" (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474 [73 Cal.Rptr.2d 793].) Limited exceptions to this rule are listed in section 361.5,

subdivision (b) (hereafter subdivision (b)). Specifically, subparts (4), (10), and (11) of subdivision (b) provide, in pertinent part:

"(b) Reunification services need not be provided to a parent . . . described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶]

"(4) That the parent or guardian of the child has caused the death of another child through abuse or neglect. [¶] . . . [¶]

"(10) That the court ordered termination of reunification services for any siblings of the child because the parent . . . failed to reunify with the sibling after the sibling had been removed from that parent . . . and that parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling of that child from that parent . . . .

"(11) That the parental rights of a parent over any sibling of the child had been permanently severed, and this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling of that child from the parent."

Once the juvenile court finds that one or more of these subparts of subdivision (b) applies, the court is prohibited from ordering reunification services unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child. (§ 361.5, subd. (c).)

Here, the court appears to have determined that Carrie was not a person described in subdivision (b)(10) or (11) of section 361.5. Those two exceptions require a two-pronged analysis. There is no dispute that the first prong is met as to each subpart: the statute applies to Carrie to the extent she failed to reunify with Jacob and Alexis, and parental rights were severed as to Justin. The issue at the hearing was whether the second prong of subparts (10) and (11) of subdivision (b) kept Carrie within the confines of those provisions. The court found it did not, as Carrie had made "reasonable effort to treat the problems that led to removal" of Ethan's siblings. (§ 361.5, subd. (b)(10) & (11).) The department does not challenge this determination but, instead, argues the juvenile court abused its discretion when it found reunification would be in Ethan's best interest despite the fact that Carrie was a person described in subdivision (b)(4).

■ When sufficiency of the evidence to support a finding is challenged on appeal, the appellate court determines if there is any substantial evidence to support the finding. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75 [82 Cal.Rptr.2d 493].) Moreover, the court cannot reverse the juvenile court's

determination, reflected in the dispositional order, of what would best serve the child's interest, absent an abuse of discretion. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [57 Cal.Rptr.2d 861].) In this case we conclude that the juvenile court's finding that reunification services would be in Ethan's best interest is not supported by substantial evidence, and that the court did abuse its discretion in ordering those services be provided.

It has often been noted that "[f]amily preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200].) However, as we noted in *In re Baby Boy H.*, *supra*, 63 Cal.App.4th at page 478, "Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]" Subdivision (b)(4) of section 361.5 evidences the Legislature's recognition that some situations are so extreme as to require extraordinary caution in recognizing and giving weight to the usually desirable objective of family preservation. As noted in *In re Alexis M.* (1997) 54 Cal.App.4th 848, 850–851 [63 Cal.Rptr.2d 356], when child abuse results in the death of a child, such abuse "is simply too shocking to ignore" in determining whether the offending parent should be offered services aimed at reunification with a surviving child. "The fact of a death and a subsequent petition . . . arising out of that death simply obliterates almost any possibility of reunification . . . ." (*Id.* at p. 851, fn. 2.)[4]

The Legislature has, nevertheless, left open a "tiny crack" to the parent who has been responsible for the death of his or her child. (*In re Alexis M.*, *supra*, 54 Cal.App.4th at p. 851, fn. 2.) Subdivision (b)(4) of section 361.5 can be overcome by a showing, made with clear and convincing evidence, that reunification would be in a surviving child's best interest. (§ 361.5, subd. (c).)

The lower court's conclusion here that reunification would be in Ethan's best interest evidently was based on the court's concomitant finding that Carrie had "made significant progress towards alleviating or mitigating the causes of the children's placement in out-of-home care." This finding of significant progress is supported by substantial evidence. Carrie had been visiting with Ethan weekly, and the visits had gone well. She held him, fed

---

[4] In *Alexis M.*, the parent had been convicted of felony child abuse. As the court there noted, the statute was amended in 1997 to delete reference to any felony conviction. (Stats. 1997, ch. 793, § 18; *In re Alexis M.*, *supra*, 54 Cal.App.4th at p. 850.) As amended, section 361.5, subdivision (b)(4) applies where the juvenile court has found by clear and convincing evidence that "the parent . . . has caused the death of another child through abuse or neglect."

him, and changed him appropriately. To quote the social worker's report, "The mother gave the child all of her attention and would look into the child's eyes. The child seemed to respond by looking into the mother's eyes. The child did not seem distressed and never once cried during the visit." Likewise, Carrie was doing reasonably well in progressing with various program components. She was demonstrating sobriety, had completed drug treatment programs, and continued to attend Narcotics Anonymous meetings. Though she still appeared unwilling or unable to acknowledge her role in the death of Charles, she had completed a parenting class and was continuing to attend classes and engage in counseling regarding family violence.

While the court's finding that Carrie had made progress in alleviating the problems that had led to her children being taken from her was supported by substantial evidence, however, that same evidence did not provide support for the finding that reunification would be in Ethan's best interest.

■ The concept of a child's best interest "is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult." (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704 [117 Cal.Rptr. 856].) To that end, a court called upon to determine whether reunification would be in a child's best interest may, indeed, consider a parent's current efforts and fitness as well as the parent's history. (See *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 750 [110 Cal.Rptr.2d 828, 28 P.3d 876].) It must be noted, nonetheless, that the absence or amelioration of the problems that led to the dependency of siblings cannot alone support a finding of best interest for the purpose of section 361.5, subdivisions (b)(4) and (c). (Cf. *In re Stephanie M.* (1994) 7 Cal.4th 295, 323, 325 [27 Cal.Rptr.2d 595, 867 P.2d 706] [contrasting a showing of best interest with a showing of the absence of detriment].) The absence of a negative does not, in this context at least, make a positive. The parent responsible for the previous death of another child must affirmatively show that reunification would be in the best interest of a surviving child.

■ The gravity of the problem that led to the dependency also is relevant to the question of best interest. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 [65 Cal.Rptr.2d 495].) It is difficult to imagine any problem more grave than the previous death of another child caused by abuse or neglect. Assuming, without deciding, that the factor of another child's death should not be weighed twice—first in connection with the section 361.5, subdivision (b)(4) finding and again in determining best interest—we must remember that, here, the previous death of another child is combined with a long history of drug abuse, family violence, and the abuse and neglect of other children even after

extensive reunification services had been provided.[5] Here it does not appear that the lower court considered this factor. Indeed, it appears the court did not.

■ The "strength of relative bonds between" the dependent child and "*both* parent and caretakers" is another factor the courts have identified as relevant to the determination of the child's best interest. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532; see also *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 324.) The evidence here was uncontradicted that, while Carrie and Ethan interacted normally during their weekly one-hour visits, the child was bonded not to Carrie but to his caretaker. According to the social worker, when Ethan's caretaker appeared after visits between Ethan and Carrie, Ethan would turn to the caretaker, catch her eye and smile and coo at the caretaker. He gave Carrie about the same recognition he gave the social worker, and would smile at both because he was "a very happy child."

■ Of paramount concern in the determination of a child's best interest, after it is determined that reunification is no longer necessarily the objective, is the child's need for stability and continuity. (See *In re Christina A.* (1989) 213 Cal.App.3d 1073, 1079–1080 [261 Cal.Rptr. 903].) Here, the record demonstrates that Ethan was detained within days of his birth and thereafter remained with the same caretaker, a relative who was ready and willing to provide long-term care. Carrie, on the other hand, acknowledged that her recovery would be a "lifetime process." She stated, "I've got a long history of substance abuse and physical abuse by a partner. It's just not going to take, you know, three months to get over. . . ." To borrow the words of Presiding Justice Sills in *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67 [74 Cal.Rptr.2d 770]: " 'Children should not be required to wait until their parents grow up.' [Citation.] [Carrie] has had many opportunities to gain control of her life and thereby maintain custody of her children. [Ethan]'s . . . future[] should not be sacrificed to give her another chance to try to get and stay sober." (*Id.* at p. 73.) Again, the lower court does not appear to have considered Ethan's need for stability in directing that reunification services be provided.

■ Carrie relies here on the immutable fact that she is Ethan's birth mother to show that reunification is in his best interest. In support, she cites *In re Elizabeth R.*, *supra*, 35 Cal.App.4th 1774, and contends the "primary

---

[5] Carrie received 18 months of reunification services after Jacob and Alexis were removed from her in March 1993. From September 15, 1994, to September 11, 1995, she received family maintenance services. Beginning at the end of April 1997, Carrie received 15 months of family reunification for Jacob and Alexis, and then eight months of services for Justin. On April 5, 1999, Carrie began receiving family maintenance services for Justin, which lasted until his dependency was dismissed on September 30, 1999.

focus of the trial court must be to save troubled families, not to create new ones." *Elizabeth R.*, however, did not address denial of reunification pursuant to section 361.5, subdivision (b)(4). Likewise, *In re Kieshia E.* (1993) 6 Cal.4th 68 [23 Cal.Rptr.2d 775, 859 P.2d 1290], upon which Carrie also relies, does not address application of subdivisions (b) and (c). Further, the court in *Kieshia E.* recognized that, though we "abhor the involuntary separation of parent and child," the state may disturb that relationship "for strong reasons and subject to careful procedures." (*In re Kieshia E., supra,* at p. 76.) As we recognized in *Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741 [50 Cal.Rptr.2d 858], where a parent has caused severe physical harm to a child—here it was death by abuse or neglect—the risk of parental recidivism bears on the question whether the parent "deserve[s] a second chance." (*Id.* at p. 751.) No presumption in favor of the natural parent-child relationship obtains where the parent has been found to have caused the death of another child within the ambit of subdivision (b)(4).

Carrie also relies on *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450 [118 Cal.Rptr.2d 118], where the appellate court stated that "[i]f the evidence suggests that despite a parent's substantial history of misconduct with prior children, there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so." (*Id.* at p. 1464.) *Renee J.*, however, involved section 361.5, subdivision (b)(10) which, unlike subdivision (b)(4), makes the parent's successful efforts at overcoming the problems that led to removal of a sibling a barrier to denial of reunification with another child. In that sense, subdivision (b)(10) is not so far along on the continuum of legislative response to child abuse as is subdivision (b)(4). (See *In re Elizabeth R., supra,* 35 Cal.App.4th at p. 1788.)

In the end, what we come back to is the enormous hurdle faced by a parent seeking reunification with a child after previously causing the death of another by abuse or neglect. In *In re Alexis M.*, the appellate court labeled "frivolous" the idea of reunification "with another infant" after the parent's abuse "resulting in death of a small infant . . . ." (*In re Alexis M., supra,* 54 Cal. App.4th at p. 851, 63 Cal.Rptr.2d 356.) While we find nothing about the lower court's ruling here to have been frivolous, we do conclude that the court did not apply the correct standards in examining Ethan's best interest and that the court thus abused its discretion. We further find that no substantial evidence supports the court's finding that reunification would serve Ethan's best interest.

The cases in which a parent who has been responsible for the death of a child through abuse or neglect will be able to show that reunification will serve the best interest of another child or other children will be rare. "The enormity of a death arising out of . . . child abuse swallows up almost all, if

not all, competing concerns. And, while the Legislature's wording may allow for some theoretical case where a parent can be [guilty of causing the death of a child through abuse] *and still* be accorded reunification services, this case isn't it." (*In re Alexis M., supra,* 54 Cal.App.4th at p. 853, fn. 5.)

## DISPOSITION

The order of the juvenile court granting reunification services to Carrie B. is reversed and the matter is remanded. The juvenile court is directed to enter an order terminating reunification services; the Kern County Department of Human Services is directed to set this matter for a hearing pursuant to section 361.5, subdivision (f) as soon as possible.

Vartabedian, Acting P. J., and Cornell, J., concurred.

A petition for a rehearing was denied September 21, 2004, and respondent's petition for review by the Supreme Court was denied December 1, 2004.